1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20

STEVEN ROWLES,

       Plaintiff,

    vs.

METROPOLITAN LIFE
INSURANCE COMPANY, a
corporation; and, AIR PRODUCTS
AND CHEMICALS, INC GROUP
LONG TERM DISABILITY PLAN,
an ERISA plan; DOES 1 through 10,
inclusive,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:11-cv-5158-CBM (DTBx)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

21
22
23
24
25
26
27
28

    The matter before the Court is the parties' bench trial on the briefs.  The Court has considered trial briefs and responsive trial briefs as well as the oral argument of counsel.  [Docket Nos. 28, 30, 31, 32.]

## I.    JURISDICTION

    This Court has jurisdiction over this Employee Retirement Income Security Act of 1974 ("ERISA") case pursuant to 29 U.S.C. § 1132(a)(1)(B).

## II.   PROCEDURAL AND FACTUAL OVERVIEW

**A.      Procedural Overview**

Plaintiff Steven Rowles ("Rowles") was employed as an operations technician for Air Products and Chemicals, Inc. when he stopped working on August 14, 2007 due to an alleged back condition that he re-aggravated when he slipped and fell at work. **AR 595.** Rowles submitted a claim for short-term disability benefits with Defendant Metropolitan Life Insurance Company ("MetLife"). MetLife paid short-term disability benefits until Rowles returned to work on September 29, 2007.

Rowles again stopped work on October 5, 2007, after having worked only 4.5 days. **AR 224, 228.** A few days later, Rowles was told via telephone that he was terminated because he could no longer do his job. **AR 228.** On November 11, 2008, Rowles submitted a claim for disability benefits with Air Products & Chemicals, Inc. Group Long Term Disability Plan, insured and administered by MetLife. **AR 356.** On March 20, 2009, MetLife denied the claim, stating that it did not have evidence that Rowles was disabled from October 5, 2007 until October 13, 2007 and that Rowles did not meet the waiting period in the plan. **AR 356-357.** On August 13, 2009, Rowles appealed to MetLife regarding the denial of his claim. **AR 212-215.** MetLife notified Rowles on September 2, 2009 that it was upholding its earlier decision to deny his long term disability benefits, noting that "the medical information we received does not support that you are totally disabled from your own occupation throughout the LTD elimination period and beyond." **AR 1016.** On June 1, 2010, after receiving additional medical evidence, MetLife sent Rowles a letter upholding its earlier decision to deny benefits. **AR 206.** Rowles then provided additional documentation on June 21, 2010, including a supplemental declaration in which Rowles declared that he requested medical clearance to return to work because he wanted to keep his job. **AR 478-484.** Dr.

Taylor wrote a supplemental record review report on July 20, 2010, and did not change his assessment.  **AR 555-560.**

Rowles filed his Complaint in this case, and the parties subsequently stipulated to a bench trial based on the administrative record.  [Docket No. 21.]

**B.     Findings of Fact**

1. Rowles brought or settled four or more workers compensation claims between 1993-2004.

2. Rowles was working as a production technician in August 2007 at Air Products & Chemicals, Inc.  He was there less than one year, and his job was to assist in chemical batch making by loading the proper amount of chemicals into a reactor.  His job required him to be on his feet about 90% of the time, lift up to 75 pounds, climb stairs, stoop, and bend.  **AR 227, 885.**

3. Rowles saw his physician, Dr. James A. Mays, on April 26, 2007, because of back pain from previous incidents.  **AR 227.**

4. Rowles saw a physician at Kaiser on April 27, 2007: because of back pain, and the physician took an x-ray of Rowles' back and prescribed Ibuprofen and Cyclobenzaprine.  **AR 227.**

5. Rowles slipped on the wet floor and landed on his back on August 14, 2007 after a chemical spill at Air Products & Chemicals.  **AR 227-228.**  Rowles immediately reported the injury to his employer.  **AR 228.**

6. Dr. Mays filled out a California State Disability form for Rowles on August 21, 2007, certifying that Rowles was eligible for State disability benefits.  **AR 240.**

7. Rowles received short-term disability benefits from MetLife based on his back injury from August 14, 2007 – September 26, 2007.  **AR 1016.**

8. Rowles returned to work on September 29, 2007.  **AR 228.**

9. The assistant plant manager sent Rowles home after four hours of work on October 5, 2007, because he was unable to do his job.  **AR 224, 228.**

10. Dr. Mays wrote on October 12, 2007 that Rowles was suffering from muscle spasms in his back, had a positive straight leg raising test, and that there was 100% disability. **AR 462.** Dr. Mays indicated a return-to-work date of November 10, 2007. **AR 986.**

11. Dr. Mays indicated on November 27, 2007 that the back pain had improved and that Rowles could return to work on January 4, 2008. **AR 242.**

12. Dr. Mays noted that Rowles still had severe lower back pain on February 20, 2008. **AR 243.**

13. Dr. Mays completed five forms certifying that Rowles remained disabled due to his back injury between October 4, 2007, and May 23, 2008. **AR 241-245.**

14. An x-ray showed signs of early "hypertrophic lipping" on January 29, 2008. **AR 264.**

15. Rowles was in a car accident on June 14, 2008, that aggravated his injury. **AR 262.**

16. An October 16, 2008 MRI showed a "2.8mm broad based posterior disk protrusion at L4-L5 level indenting the anterior aspect of the thecal sac. There are mild narrowings of both neural foramina. There is a broad-based symmetric disk protrusion at L5-S1 level, which at its maximum AP diameter about the midline measures about 5.6mm and is causing pressure over the anterior aspect of the thecal sac. There is partial obliteration of the lateral recesses and moderate narrowing of both foramina." **AR 262.**

17. Dr. Mays filled out a form on November 24, 2008 entitled Medical Assessment of Ability to do Work Related-Activities. **AR 258-261.** Dr. Mays indicated on the form that Rowles should only occasionally lift or carry up to 10 pounds and should never lift or carry over 10 pounds. **AR 258.** Dr. Mays wrote that Rowles can sit for only 2 hours and stand or walk for 1 hour total in an 8-hour work day, and that Rowles should never climb, stoop, crouch, kneel, or crawl.

**AR 259-60.** Dr. Mays concluded that Rowles was "100% disabled" due to his back pain. **AR 261.**

18. Rowles submitted a claim for disability benefits on November 11, 2008 to his employer's long-term disability plan insured and administered by MetLife. **AR 356.**

19. Rowles began receiving unemployment benefits at $460 per week in late 2008 or early 2009. **AR 218, 230.**

20. MetLife denied Rowles' claim for disability benefits on March 20, 2009, because it had no medical evidence of disability between October 5, 2007 and October 13, 2007, and because Rowles did not meet a 182-day waiting period (called the "Elimination Period") as required in the plan. **AR 356-57**; see Finding of Fact 40, *infra*.

21. Rowles started seeing Dr. Justin C. Long of One Stop Multi-Specialty Medical Group on June 25, 2009. **AR 878.** After an examination, Dr. Long found that Rowles had a "+3 to 4 palpable tenderness and muscle spasms over the right paralumbar musculature, as well as L3, L4, L5, and S1 spinous processes." **AR 882.** Dr. Long concluded that Rowles should not engage in bending or stooping. **AR 886.**

22. Rowles underwent a 60-minute quantitative functional capacity evaluation (QFCE) on July 21, 2009. **AR 926-934.** The test results were consistent with symptoms Rowles had reported. **AR 927, 928, 929, 933.**

23. Rowles was examined by Dr. Eduardo E. Anguizola on August 3, 2009. **AR 890.** Dr. Anguizola noted that Rowles has a positive straight leg raise, and that a July 25, 2009 MRI scan indicated he had a posterior anular tear at the L5-S1 level, a 2.7mm disc bulge at L4-5 with bilateral facet arthropathy, and a 4.1mm disc bulge at L5-S1 with bilateral arthropathy. **AR 895.**

24. Rowles was seen by Dr. Mitchell Geiger for his workers' compensation claim on August 10, 2009. **AR 852.** Dr. Geiger noted that Rowles was having difficulty dressing himself and getting on and off the toilet. AR 854. X-rays showed "tiny superior and inferior osteophytes at L5 vertebrae." **AR 859.**

25. Rowles appealed the denial of his claim on August 13, 2009, and sent medical records to MetLife. **AR 212-215.**

26. MetLife informed Rowles on September 2, 2009, that it was not changing its earlier decision because "the medical information we received does not support that you are totally disabled from your own occupation throughout the LTD elimination period and beyond." **AR 1016.**

27. Rowles was evaluated by Andreas DiMeo, Ph.D., on September 15, 2009, who concluded that Rowles suffered from pain and psychological distress with emotional and cognitive symptoms, including sadness, stress, anxiety, irritability, low energy, increased weight changes, lowered resiliency and coping with daily life stressors. **AR 742-755.** Dr. DiMeo found slower psychomotor behavior but no abnormal mental findings. **AR 752-53.** The diagnostic impression included adjustment disorder and insomnia. **AR 753.**

28. Dr. Greiger wrote a Panel Qualified Medical Evaluation Supplemental Report on December 15, 2009. **AR 731.** Dr. Greiger concluded that Rowles "is precluded from substantial work" because of the August 14, 2007 fall. **AR 738-39.**

29. Dr. Anguizola examined Rowles on December 21, 2009, and found that Rowles still suffered from a lumbar disc herniation at L5-S1 with desiccation, and anular tear at L5-S1, and radiculopathy at L5-S1 on the right with some L4 contribution. **AR 1004.**

30. Rowles underwent an Agreed Medical Evaluator (AME) examination on January 26, 2010, for his workers' compensation claim, administered by Dr.

Michael D. Ciephiela. **AR 594.** Dr. Ciepiela noted that a July 23, 2009 MRI found an annular tear, mild disc protrusion and mild neuroforaminal narrowing with encroachment on nerve roots among other irregularities. **AR 597.** Dr. Ciepeila performed a physical examination and found reduced range of motion in Rowles' lumbar spine and diagnosed him with "Aggravation of lumbar spondylosis with radiculopathy and Lumbar intervertebral disc syndrome, multi level." **AR 599.** Dr. Ciepeila concluded that Rowles had lost over 75% of his pre-injury lifting capacity, "has a marked compromise in his ability to function," and "is unable to do most all recreational activities." **AR 600.** Dr. Ciepeila also concluded that the injury was 60% the result of the August 14, 2007 fall at work, 30% the result of a 2004 injury, and 10% the result of the June 2008 car accident. **AR 601.**

31. Rowles was examined by Dr. John Larsen on February 2, 2010. Dr. Larsen's notes, as described by Rowles' treating physician, Dr. Long, indicated that there is reasonable evidence of industrial causation of the injury and that Dr. Larsen recommended that Rowles receive a lumbar epidural steroid injection. Dr. Larsen believed that if the injection did not help, Rowles would be a candidate for surgery. **AR 493.**

32. MetLife hired Dr. Howard P. Taylor to review Rowles' records on April 6, 2010. **AR 801.** Dr. Taylor concluded: "According to the records, [Rowles] did return to work on [September 27, 2007] and therefore would not be considered to have functional limitations that include any reduction in his ability to work full time as of that date." **AR 801.** He also noted that "[t]he medical records do not report what happened between 10/5/2007 when he was terminated and 10/12/2007 when he returned to see Dr. Mays."

33. Dr. Taylor wrote a supplemental record review report on April 27, 2010, but did not change his position. **AR 710-12.**

34. Dr. Mays wrote a letter on May 13, 2010, explaining that due to having suffered a stroke, he may not have written progress reports at all times in October 2007, including the period between October 5, 2007 and October 13, 2007 for which MetLife stated there was no evidence of disability.  Dr. Mays added that an assessment he had previously written described Rowles' limitations from the date Rowles fell at work, August 14, 2007, until at least November 24, 2008. **AR 460-461.**

35. MetLife upheld its earlier decision to deny benefits on June 1, 2010, stating that "the impairment level that Rowles reported does not correlate with the medical findings on file." **AR 206.**  MetLife stated in the letter that Rowles had exhausted his administrative remedies.

36. Rowles provided additional documentation and a declaration to MetLife on June 21, 2010, including a supplemental declaration in which Rowles declared that he requested medical clearance to return to work because he wanted to keep his job.

37. Dr. Taylor wrote another supplemental report on July 20, 2010, in which he reiterated his opinion that because Rowles worked 4 ½ days, "he would not be considered to have functional limitations." **AR 560.**

**The Plan**

38. Under the MetLife plan at issue (the "Plan"), MetLife had "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." **AR 1100.**

39. MetLife's determinations "shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." ***Id*.**

40. Disability was defined under the plan to mean:

1

> Due to Sickness or as a direct result of accidental injury .
> . . . You are receiving Appropriate Care and Treatment
> and complying with the requirements of such treatment;
> and You are unable to earn: during the [182-day]
> Elimination Period and the next 24 months of Sickness
> or accidental injury, more than 80% of Your
> Predisability Earnings at Your Own Occupation in Your
> Local Economy, and after such period, more than 60%
> of your Predisability Earnings from any employer in
> Your Local Economy at any gainful occupation for
> which You are reasonably qualified taking into account
> Your training, education, and experience.

2

3

4

5

6

7 **AR 1066.**

8 ### III.  STANDARD OF LAW

9       The standard of review for plans, like this plan, in which the administrator

10 or fiduciary has discretionary authority to determine eligibility for benefits or

11 construe the terms of the plan is an abuse of discretion.  *Firestone Tire & Rubber*

12 *Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the administrator or fiduciary is

13 operating under a conflict of interest, that conflict must be weighed as a "facto[r]

14 in determining whether there is an abuse of discretion."  *Id.* (quoting Restatement

15 (Second) of Trusts § 187, Comment d (1959)).  The Supreme Court has noted that

16 when the plan administrator is an insurance company, as MetLife is here, there is a

17 conflict of interest that should be considered as a factor:

18

> A plan administrator's dual role of both evaluating and
> paying benefits claims creates the kind of conflict of
> interest referred to in *Firestone*.  That conclusion is clear
> where it is the employer itself that both funds the plan
> and evaluates the claim, but a conflict also exists where,
> as here, the plan administrator is an insurance company.
> . . .  The significance of the conflict of interest factor
> will depend upon the circumstances of the particular
> case. . . .  *Firestone* means what the word 'factor'
> implies, namely, that judges reviewing a benefit denial's
> lawfulness may take account of several different
> considerations, conflict of interest being one. . . .  Any
> one factor will act as a tiebreaker when the others are
> closely balanced.

19

20

21

22

23

24

25

26 *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 106-07 (2008); *see also Abatie v. Alta*

27 *Health*, 458 F.3d 955, 968-969 (9th Cir. 2006) (accord); *Renfro v. Funky Door*

28

*Long Term Disability Plan*, 686 F.3d 1044, 1049 (9th Cir. 2012) ("[W]e are to treat the existence of a conflict of interest as 'a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision.'") (quoting *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009)).

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir.2005). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)).

## IV.  CONCLUSIONS OF LAW

The Court finds that there is a conflict of interest because the plan administrator, MetLife, is also the insurer, and the Court considers this as a factor in its analysis.  Even without this factor, however, it is clear when analyzing the three *Boyd* factors that MetLife abused its discretion in denying benefits to Mr. Rowles.

**A.     Whether MetLife Rendered a Decision Without Explanation**

MetLife rendered its decision with an explanation.  Plaintiff does not contest this fact, but instead argues that the explanation was unfounded and unreasonable.

**B.     Whether MetLife Construed the Provisions of the Plan in a Way That Conflicts With the Plain Language of the Plan**

Plaintiff does not argue that MetLife construed any particular provisions

incorrectly.  Instead, Plaintiff argues that MetLife gave unfounded or unreasonable explanations for its denial.

**C.    MetLife Relied on Clearly Erroneous Findings of Fact**

MetLife relied on erroneous findings.  First, it relied far more on the opinions of its own doctor rather than on the diagnoses of other examining doctors.  Second, it erred in finding that Rowles was not disabled simply because his recommended treatment was often conservative.  Third, MetLife erred in concluding that Rowles was not disabled because Rowles attempted to return to work.  After reviewing all evidence including these errors, this Court has a definite and firm conviction that a mistake has been committed in denying Mr. Rowles benefits.

## 1.    MetLife Erred in Giving More Weight to Dr. Taylor's Opinion Than Those of the Doctors Who Evaluated Rowles.

Plaintiff was examined by at least seven doctors and underwent an array of tests on his back.  The doctors diagnosed Plaintiff with considerable physical ailments in his back that corroborated Plaintiff's own claims of severe pain.  Dr. Mays found repeatedly that Rowles was "100% disabled."  MetLife places great weight on Dr. Taylor's opinion.  Dr. Taylor was hired by MetLife to act as an independent medical expert.  Dr. Taylor never examined or saw Rowles.  Plaintiff has submitted evidence obtained during discovery that MetLife paid Dr. Taylor over $23,000 in 2008, over $117,000 in 2009 and over $110,000 in 2010 to conduct 418 reviews.  (Plaintiff's Trial Brief, Exhibit 3, pp. 6-7.)  *See Oster v. Standard Ins. Co.*, 759 F.Supp.2d 1172, 1186 (N.D. Cal. 2011) ("In this case, Dr. Dickerman and Dr. Toenniessen benefited financially from Standard's repeat business. . . . This evidence demonstrates that Standard failed to use a 'truly independent medical examiner or a neutral, independent review' . . . .  Therefore, Standard's denial should be viewed with the high skepticism.").  Dr. Taylor was

the only doctor out of many to find that Rowles was able to work with his injury, yet Dr. Taylor was the only one of these doctors not to personally examine Rowles.  The Court therefore finds that MetLife erred in relying far more on the opinions of its own doctor rather than on the diagnoses of other examining doctors.

### 2.  The conservative treatment prescribed by Rowles' treating physicians are not grounds for denying benefits.

MetLife argues that Rowles was not disabled because he was given conservative treatment consisting of physical therapy, Motrin, and heat packs. This finding was erroneous because it ignores that Dr. Larsen recommended on February 2, 2010 that Rowles receive a lumbar epidural steroid injection and that Dr. Larsen believed that if the injection did not help, Rowles would be a candidate for surgery.  Additionally, MetLife has provided no legal authority or supporting expert opinion for its finding that this treatment advice somehow means that Rowles should have been denied benefits or was able to work.  The Court finds that these treatment plans do not provide a sufficient basis for denying Rowles benefits.

### 3.  Rowles' return to work does not mean he was not disabled.

MetLife and Dr. Taylor emphasized the fact that Rowles went back to work, and deduced from this that Rowles was able to work.  While it is true that Rowles attempted to work, and received Dr. Mays's release to return to work, Rowles was sent home and terminated because he was clearly unable to physically perform his job.  The Court finds that MetLife erred in making the finding that Rowles' attempt to return to work meant that he was not disabled.

/ / /

/ / /

/ / /

The Court finds, therefore, that Defendants abused their discretion by denying benefits.

**IT IS SO ORDERED.**

DATED: December_17, 2012

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE